UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOHN BENEDICT,

                                Plaintiff,                                Case No. 15-cv-10138

v                                                          Honorable Thomas L. Ludington

UNITED STATES OF AMERICA,

                                Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff John Benedict initiated this matter by filing his complaint against Defendant United States on January 14, 2015 seeking damages under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq*. and 28 U.S.C. § 1346(b)(1). *See* Compl., ECF No. 1. Plaintiff alleges that Defendant United States operates the Clare Community Outpatient Clinic ("Clare VA") through its agency, the Department of Veteran Affairs. *Id*. at ¶ 7.  Plaintiff further alleges that Defendant through its agents, employees and staff – in particular through Dr. Brenda Harshman – breached its duty of care to him by failing to timely recognize symptoms of appendicitis and refer to him to the nearest ER.  *Id*. at ¶ 38. As a result, Plaintiff alleges that he was required to undergo surgery, and that he continues to experience abdominal pain, gastrointestinal issues, and fatigue. *Id*. at ¶¶ 27-35.

At the close of discovery, on April 25, 2016, Defendant United States moved for summary judgment. *See* Def.'s Mot. Summ. J., ECF No. 30.  Plaintiff filed a response opposing the motion on May 16, 2016.  *See* Pl.'s Resp. to Mot. Summ. J., ECF No. 33.  For the reasons stated below, Defendant's motion will be denied.

**I.**

Plaintiff John Benedict is a veteran and resident of Osceola County, Michigan. *See* Compl. ¶ 6. Defendant United States, through its agency the Department of Veterans Affairs ("VA"), operates the Clare VA located at 11775 N. Isabella Road, Clare, Michigan. *Id*. at ¶ 7. The Clare VA provides primary care services to veterans. *See* Harshman Dec. ¶ 1, ECF No. 30-5. While Benedict had previously visited other VA clinics that provide urgent care and emergency services to veterans, such as the Saginaw VA facility and the Ann Arbor VA facility, the Clare VA does not, and a sign on the door specifically states "No Emergency Services Available." at ¶ 2; *See also* ECF No. 30-6; Benedict Dep. 50. Benedict had also previously used the VA's TeleNurse service, which allows veterans to call a telephone number that will direct them to the appropriate medical facility. *See* Benedict Dep. 51.

Doctor Brenda Harshman, a duly licensed doctor of osteopathic medicine is an employee of the Department of Veteran Affairs, and has provided services at the Clare VA since 2008. *See* Harshman Dec. ¶ 1. Dr. Harshman has been licensed to practice internal medicine for over 20 years. *Id*.

### A.

The relevant facts are largely undisputed. After eating a dinner of fish and salad the night of Thursday, August 29, 2016, Plaintiff Benedict began vomiting at around 9:00 PM. He continued vomiting until around 6:00 AM on Friday August 30, 2016. After he ceased vomiting, Benedict still was experiencing abdominal pain, so he crushed a tramadol he had previously been prescribed for an unrelated condition and took it with water. Benedict Dep. 43, 78. While the tramadol improved his abdominal pain, the pain did not fully abate. *Id*. Benedict therefore drove himself to the Clare VA to seek treatment at approximately 12:55 PM.

As noted above, the Clare VA does not provide emergency services, and Benedict did not feel like he needed emergency services at the time he sought treatment. Benedict Dep. 68. Benedict had never previously been treated at the Clare VA, and presented himself as a walk in. *Id*. at 48. At the time he presented, Benedict claimed that his pain level was a 3 on a scale of 10, meaning that his pain was uncomfortable but tolerable. *See* Clare VA Notes p. 1, ECF No. 30-2; Pain Scale, ECF No. 30-9.  At 12:55 PM his temperature was normal. *See* Clare VA Notes p. 1, ECF No. 30-2.  At that time Benedict had a blood pressure of 200/130.  *Id*.  By 1:12 PM his blood pressure had decreased to 173/108.  *Id*.

Benedict met with Nurse Angela E. Johnson at 1:13 PM.  *Id*. at p. 3. In her report Johnson noted that Benedict was a veteran complaining of pain in the right upper quadrant of his abdomen. *Id*. She noted that he had denied any "fever, dizziness, lightheadedness, [or] numbness/ tingling." *Id*.  She also noted that Benedict had not consumed any fluid or food since the previous night. *Id*. Nurse Johnson further stated that Benedict reported mild to moderate pain in his right upper quadrant, with no pain when lying down but a pain of 4 or 5 when sitting. *Id*. *See also* Pain Scale, ECF No. 30-9 (describing pain in the 4 and 5 range as bad pain that is difficult to ignore and limits activities). She also noted that his bowl sounded hypoactive in the upper quadrant. *See* Clare VA Notes p. 3.

Benedict met with Dr. Hartman at around 1:49 PM. *Id*. at 2.  At the time of the examination Benedict had a temperature of 98.8 and blood pressure of 176/100. *Id*. at 3.  Benedict had stopped vomiting, was no longer nauseous, and was able to keep some liquids down. *Id*. According to Dr. Harshman's treatment notes, Benedict complained of abdomen pain in his right upper quadrant and right lower quadrant. *See* Clare VA Notes p.1 ("pt walks in with c/o abd pain ruq and rlq). Dr. Harshman's notes indicate that while the tramadol had helped

Benedict with the pain, he "still has some pain mid to right upper quad…." *Id*.  Specifically Benedict reported some pain in his belly when she pushed on the right upper quadrant of his abdomen, however Dr. Harshman reported that Benedict was sitting in a relaxed position, and did not appear to be in any pain while sitting.  *Id*. He was able to cough without pain. *Id*. He was also able to lie down and stretch his legs, even hyperextending his hips without grimacing or appearing to be in pain. *Id*. Dr. Harshman reported that Benedict did not report signs of rigidity or guarding. *Id*.  She reached a differential diagnosis of "abdominal pain, no acute abdomen [sic] R/O food poisoning R/O PUD but has not been taking the indicin R/O gastroenteritis." *Id*.  Her differential diagnosis did not include appendicitis. *Id*.

Dr. Harshman directed Benedict to take medicine with sips of water and, noting that his condition was already improving, directed him to advance his diet as his condition improved. *Id*. She also directed him to follow up at the Ann Arbor VA the following Tuesday, which was his primary clinic. *Id*.  Finally, Dr. Harshman told Benedict to go to the ER or to urgent care if his symptoms worsened, specifically if he had a fever greater than 100, experienced increasing abdominal pain, began intractable vomiting, felt weak or like he would pass out, or experienced any other worsening of any other kind that concerned him. *Id*. at 3.

Nurse Johnson also instructed Benedict to seek emergency services if he experienced a fever greater than 100, increased pain, weakness, or continuous vomiting. *Id*.  Benedict was not prescribed any pain medication.  He was released from the Clare VA at around 2:00 PM and drove himself home. *See* Benedict Dep. 88.

**B.**

At some point that evening after leaving the Clare VA Benedict began continuously vomiting. *See* Benedict Dep. 65.  Benedict also began sweating profusely, and experienced pain

- 4 -

that he rated as 10 out of 10. *Id*. at 65-66. Despite his emergency symptoms, Benedict did not seek emergency treatment until the following morning.

Benedict arrived at MidMichigan Health's Clare location ("MMH") at 11:35 AM on Saturday, August 31, 2013. *See* ER Notes, ECF No. 30-3. At 11:36 AM Benedict was triaged by Nurse Nicole Tipton, RN. *Id*. At the time Benedict's chief complaint was pain in his right lower abdomen. *Id*. at. 4. He informed Nurse Tippins that "he was seen at VA yesterday for appendix and was told nothing was wrong – no testing done…." *Id*. He further stated that his "pain increased today and felt really warm approx. 1 hour ago…." *Id*. Benedict's temperature was 97.3 degrees. Nurse Tippins took Benedict to a room and performed an initial assessment shortly thereafter, at 11:40 AM. *See* Tippins Dep. 25. At the time Benedict reported a pain of 9 out of 10 in his right *upper* abdomen. *See* ER Notes 6.

Blood labs were ordered for Benedict at 1:04 PM, which came back at 1:17 PM showing an elevated white blood cell count of 14.0 K/UL with 90% neutrophils. *See* Orders MMH-0281, ECF No. 30-16; Blood Labs, ECF No. 30-17. An x-ray and ultrasound were then ordered at 1:13 PM to determine the cause of Benedict's pain and to rule out possible conditions. The ultrasound was ordered to rule out gallstones, which often result in pain in the upper right quadrant of a patient's abdomen. *See* Tippins Dep. 34; Nunoo Dep. 31-32, ECF No. 30-19. *See* Orders. MMH 0273, 0279. While waiting for the tests to be performed, Benedict reported a pain of 9 out of 10 at 1:35 PM. *See* ER Notes 6. The x-ray was eventually performed at 2:03 PM, and the ultrasound was performed at 4:04 PM. *See* Images, ECF No. 30-18.

A CT scan, which may assist in ruling out appendicitis, was not ordered by MMH staff until 4:20 PM. *See* Orders, MMH-0272. At 5:08 PM, Benedict was nauseous and experiencing present bowl sounds in all four quadrants of his abdomen. ER Notes 3. Benedict again identified

his primary pain location as his upper right abdomen. *Id*. He reported his pain as 9 out of 10, and reported nausea. *Id*. Nurse Tippins noted that Benedict appeared alert, calm, cooperative, and oriented to his own ability.  *Id*. at 2. The CT Scan was performed at 6:51 PM, and was "consistent with acute appendicitis." *See* Images, MMH-0384.  The result of the CT Scan was reported to the ER at 7:10 PM. *Id*.  At that time, Nurse Tippins reported that Benedict was "moaning out in pain".  ER Notes 2. Benedict received antibiotics for the first time at 7:14 PM. *See* Orders. MMH-0354.

General Surgeon Robert Nunoo performed a medical history and physical examination of Benedict at 9:02 PM. Dr. Nunoo reported that Benedict was "[v]ery tender in the right lower quadrant with rebounding, [and] guarding" and that Benedict "present[ed] with severe right lower quadrant pain with nausea, vomiting." *See* Nunoo Exam MMH-0042, ECF No. 30-21. Based on his examination, Dr. Nunoo diagnosed Benedict with appendicitis, and orders a "laparoscopic appendectomy, possible open." *Id*.  Dr. Nunoo commenced the surgery at 9:23 PM, but was unable to find Benedict's appendix laparoscopically due to a large inflammatory mass surrounding the appendix and cecum. *See* Op. Rep. MMH-0044-45; ECF No. 30-22. He therefore converted to an open procedure with the assistance of another physician, Trung Nguyen. *See* Nunnoo Dep. 36, ECF No. 30-19.  After the conversion, Dr. Nunoo discovered that Benedict's appendix had ruptured and there was some stool spillage. *See* Op. Rep. MMH-0044-45. Because it was impossible to remove Benedict's appendix alone due to the inflammatory mass, Dr. Nunoo and Dr. Nguyen performed an ileocecectomy, removing Benedict's cecum as well as his appendix. *Id*. at MMH-00045.

A few days after the surgery, on September 2, 2013, Benedict alleges that he had not had a bowel movement and was experiencing pain at the incision site. *See* Compl. ¶ 28.   He was

diagnosed with paralytic ileus and an NG tube was placed. *Id.*  On September 6, 2013, Benedict had an elevated white blood count, and by September 9, 2013 he had developed a greenish brown discharge from his wound. *Id.* at ¶¶ 29-30.   As a result he was prescribed TPN and diagnosed with colcutaneous fistula.  *Id.* at 30-31. After being transferred to the John D. Dingell VA medical center in Detroit, Benedict was placed on antibiotics, his wound improved, and his diet slowly advanced. *Id.* at ¶¶ 32-33.

Benedict was discharged from the hospital on September 16, 2013. *Id.* at ¶ 34.  Benedict alleges that following his discharge he required home health care and dressing changes twice daily for several weeks. *Id.*  He further alleges that he has experienced ongoing abdominal pain, gastrointestinal issues, and fatigue. *Id.* Benedict concludes that, "[h]ad Dr. Harshman complied with the applicable standards of care… definitive treatment would have been available that would have avoided both the rupture of his appendix, the need for the ileocectomy, and the subsequent complications." *Id.* at ¶ 35.

## II.

Defendant United States now moves for summary judgment on Plaintiff Benedict's claim.  A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether

the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## A.

The Federal Tort Claims Act ("FTCA") states that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674.  This provision has been held to mean that liability of the federal government is determined by the law of the State in which the incident in question occurred. *See Young v. United States*, 71 F.3d 1238, 1242 (6th Cir. 1995).  Michigan law therefore applies to this FTCA medical malpractice action, and Plaintiff Benedict bears the burden of proving: "(1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. Failure to prove any one of these elements is fatal." *Cox ex rel. Cox v. Bd. of Hosp. Managers for City of Flint*, 651 N.W.2d 356, 361 (Mich. 2002) (quotation and citation omitted). If the defendant practitioner is a specialist, then the plaintiff bears the burden of proving that the defendant "failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury."  Mich. Comp. Laws § 600.2912a(1)(b).  "As a general rule, Michigan courts require expert testimony in medical-malpractice cases, particularly for establishing the applicable standard of care and causation."  *Kava v. Peters*, 450 F. App'x 470, 475 (6th Cir. 2011).

The parties agree that Dr. Harshman is a primary care physician that is board certified in internal medicine. *See* Farber Dep. 23-24.  The parties disagree as to whether Dr. Harshman breached the applicable standard of care. The parties also disagree as to whether Dr. Harshman's conduct caused Benedict's ultimate injuries, and whether Benedict was in fact responsible for his own injuries under Michigan's comparative fault doctrine.

**i.**

Through his standard of care expert, Doctor Neil J. Farber, M.D., FACP Plaintiff argues that Dr. Harshman breached the applicable standard of care. In his affidavit, Dr. Farber notes that he is board certified in internal medicine and that he has spent the majority of his professional time practicing as an internal medicine physician. *See* Farber Aff., ECF No. 30-26. Dr. Farber testifies that Dr. Harshman breached the applicable standard of care by failing to perform and appreciate thorough patient histories and physical examinations, failing to recognize signs of appendicitis or another emergency abdominal condition, failing to properly account for Benedict's ingestion of Tramadol, and failing to immediately direct Benedict to the nearest emergency room. *Id*; *See also* Farber Dep. 58, 67, 77.

Defendant United States argues that Dr. Harshman did not breach the relevant standard of care because Benedict did not exhibit any of the typical symptoms of appendicitis. *See* Mot. Summ. J. 18-20; Harshman Dep. ¶¶ 4-5, 9.  Plaintiff's expert acknowledges that Benedict did not have the classic signs of appendicitis such as vomiting, constipation, or right lower quadrant pain, at the time he was examined at the Clare VA. *See* Farber Dep. 72.  However, Dr. Farber argues that Benedict had signs of an emergency condition, such a focal pain and high blood pressure, which warranted immediate referral to an ER that had access to immediate labs and radiologic imaging. *Id*. at 73. He also argued that Benedict's symptoms could have been masked

by the Tramadol and by dehydration as a consequence of vomiting all night. *Id*. at 72. Because

Plaintiff's expert and Dr. Harshman disagree about the relevant standard of care and whether

there was a breach of that standard, there is a material dispute as to a question of fact on this

point.

**ii.**

Defendant also argues that summary judgment is appropriate because Plaintiff cannot

establish causation.  Specifically, Defendant argues that Plaintiff's cecum was removed due to a

large inflammatory mass, not because of his ruptured appendix. Defendant argues that such

inflammatory masses are rare, unpredictable, and unrelated to whether a patient's appendix has

ruptured.

In contrast, Plaintiff's causation expert, Dr. Jordan Goodstein, testified that an

inflammatory mass adhering to the adjacent bowel generally only happens when a patient has

perforated. *See* Goodstein Dep. 17. One of the operating surgeons agreed with this assessment as

follows:

Q: Do you have any idea what caused that to happen?

A: The inflammation?

Q: Yes.

A: Yes. I think it was he had appendicitis and he had a perforation, I think that
was part of the whole picture, you know, that the cecum was inflamed because of
the perforation and the appendicitis.

*See* Nunoo Dep. 20.   Dr. Nunoo further explained the possible relationship between the

inflammatory mass and the perforation as follows:

Q: In Mr. Benedict's case, did he have a perforated appendix?

A: He did, yes.

Q: And did that contribute to the size of the inflammatory mass he had?

A: I would think so.  I would think a perforation makes the inflammation worse.

Q: What about it makes it worse?

A: Because when you have a perforation, that in his case there was some stool, a little bit of stool that came out, and that contains bacteria so I think that makes the inflammation worse.

*See* Nunoo Dep. 42.  Plaintiff's causation expert further testified that an inflammatory mass such as the one experienced by Benedict would take at least 24 to 48 hours to develop, and that "there's significantly greater than a 50 percent probability that had he been either put on antibiotics or operated on promptly that he wouldn't have had the inflammatory mass and the need for the ileocecectomy and the fistula and the diarrhea." *Id*. at 15-16. In other words, Plaintiff argues that it is more likely than not that Benedict's surgery and resulting complications would not have occurred if Dr. Harshman had timely diagnosed appendicitis or immediately referred Benedict to the nearest facility capable of performing labs and diagnostic tests. This remains a material dispute to be resolved by a trier of fact.

**iii.**

Finally, Defendant argues that summary judgement is appropriate because Plaintiff was more than 50 percent at fault for his injuries due to his failure to seek emergency medical assistance when his symptoms returned on the night of August 30, 2013. Defendant concludes that Benedict is therefore barred from recovery under Michigan's comparative fault doctrine. This argument is belied by the very cases cited by Defendant, which establish that it is for the trier of fact to allocate fault. *See Yax v. Knapp*, WL 2683793 at *2-5 (Mich. Ct. App. Sept. 19, 2006 ("Medical malpractice actions, like other actions for negligence, are subject to the doctrine of pure comparative negligence; therefore the [fact-finder] must determine the percentage of the

total fault of all persons who contribute to the plaintiff's injuries….”). Because allocating fault is

a question for trial, summary judgment is inappropriate on this point.

## III.

Accordingly, it is **ORDERED** that Defendant's motion for summary Judgment, ECF No.

30, is **DENIED.**

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: August 23, 2016

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on August 23, 2016.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager
